# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
Release No. 9362 / September 18, 2012

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 67878 / September 18, 2012

**INVESTMENT ADVISERS ACT OF 1940**
Release No. 3467 / September 18, 2012

ADMINISTRATIVE PROCEEDING
File No. 3-15031

| | |
|---|---|
| **In the Matter of**<br><br>ADVANCED EQUITIES, INC.,<br>DWIGHT O. BADGER, AND<br>KEITH G. DAUBENSPECK,<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SECTIONS 203(e) AND 203(f) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Sections 203(e) and 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Advanced Equities, Inc., Dwight O. Badger and Keith G. Daubenspeck ("Respondents").

**II.**

In anticipation of the institution of these proceedings, the Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Section 15(b) of the Securities Exchange Act of 1934 and Sections 203(e) and 203(f) of the

Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and the Respondents' Offers, the Commission finds[1] that:

### Summary

1. This matter involves misstatements and omissions and supervisory failures during a $150 million late stage private equity offering in 2009 and a follow-up offering in 2010 by registered broker-dealer and investment adviser Advanced Equities, Inc. ("Advanced Equities") on behalf of a non-public alternative energy company located in the Silicon Valley region of California ("Company A"). During the 2009 offering, Company A was in "stealth mode" and released very little information about itself. Dwight O. Badger ("Badger"), one of Advanced Equities' registered principals, led Advanced Equities' sales efforts for the offering and personally conducted numerous sales calls with investors and Advanced Equities' registered representatives (whom it called "brokers"). Badger also held five internal sales calls with Advanced Equities' brokers. During both the internal and external sales calls, Badger made several significant misstatements about Company A's finances, including, among other things: (a) misstating that Company A had order backlogs in excess of $2 billion, when in fact Company A's actual backlog ranged between approximately $10 million and $42 million; (b) misstating that the U.S. Department of Energy had already granted Company A a loan of between $250 million and $300 million, when in fact Company A had just recently applied for a $96.8 million loan; and (c) misstating that Company A had a $1 billion order from a national grocery store chain, when in fact the grocery store chain only had entered into an order for $2 million and signed a non-binding letter of intent to purchase additional energy in the future. In addition, Advanced Equities' other registered principal and Badger's supervisor, Keith G. Daubenspeck ("Daubenspeck"), failed to respond to red flags that indicated that Badger and certain of Advanced Equities' other brokers were making misstatements to investors and thus, failed reasonably to supervise with a view toward preventing and detecting their violations of the federal securities laws.

### Respondents

2. Advanced Equities, Inc., is an Indiana corporation with headquarters in Chicago, Illinois. Advanced Equities has been registered with the Commission as a broker-dealer pursuant to Section 15 of the Exchange Act since 1993 and as an investment adviser pursuant to Section 203 of the Advisers Act since 2007. It currently employs more than 80 registered representatives (whom it calls "brokers") in its Chicago, Illinois headquarters and its branch offices in San

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

Francisco, California and New York, New York.  It is a wholly-owned subsidiary of Advanced Equities Financial Corporation.

3. Dwight O. Badger, age 42, resides in Lake Forest, Illinois.  Badger is a co-founder and, until August 6, 2012, was the registered principal of Advanced Equities and the president and chief executive officer of its parent, Advanced Equities Financial Corporation, of which he owned approximately 8%.  Badger has been in the securities industry since 1989 and at all relevant times has held the following FINRA licenses:  General Securities Representative (Series 7), General Securities Principal (Series 24) and Uniform Securities Agent State Law (Series 63).

4. Keith G. Daubenspeck, age 49, resides in Chicago, Illinois.  Daubenspeck is a co-founder and registered principal of Advanced Equities and is the chairman of the board of directors of its parent, Advanced Equities Financial Corporation, of which he owns approximately 11%.  Daubenspeck has been in the securities industry since 1986 and at all relevant times has held the following FINRA licenses:  General Securities Representative (Series 7), General Securities Principal (Series 24) and Uniform Securities Agent State Law (Series 63).

## Other Relevant Entities

5. "Company A" is a private Delaware corporation with headquarters and manufacturing facilities in the Silicon Valley region of California.  Company A manufactures a device that uses proprietary technology to produce power on a clean and efficient basis and that, during the relevant time period, sold for approximately $1 million with a recommended maintenance contract.  During 2009, Company A operated in "stealth mode" meaning that it provided scant information to the public about its finances, operations or technology.  In February 2010, Company A emerged from "stealth mode" and publicly launched its technology.  Company A is backed by several leading venture capital firms.  Company A has never registered any class of securities with the Commission.

6. Advanced Equities Greentech III Investments, LLC ("Greentech III") is a Delaware limited liability company established on January 23, 2009 by Advanced Equities to purchase and hold shares of Company A on behalf of certain customers who were accredited investors.  Greentech III is not registered with the Commission and it has never registered any class of securities with the Commission.

7. Advanced Equities Greentech IV Investments, LLC ("Greentech IV") is a Delaware limited liability company established on January 23, 2009 by Advanced Equities to purchase and hold shares of Company A on behalf of certain customers who were qualified purchasers.  Greentech IV is not registered with the Commission and it has never registered any class of securities with the Commission.

## Background

8. In 2006, after Advanced Equities completed an earlier private equity offering on its behalf, Company A named Badger and Daubenspeck as observers to its board of directors.  As a result, Badger and Daubenspeck were permitted to attend Company A's board of director meetings

3

and to hear and view confidential information about Company A's finances, its current and prospective customers, its technology and its future plans.

9. Badger and Daubenspeck often attended Company A's board meetings either separately or together. Badger and Daubenspeck both attended Company A's fourth quarter 2008 board meeting on December 4, 2008 and its first quarter 2009 board meeting on March 3, 2009.

10. During Company A's December 2008 board meeting, Badger and Daubenspeck made a presentation to the board proposing to lead the company's $150 million "Series F" offering. The purpose of the offering was to provide Company A with working capital and a contribution to a proposed Power Purchase Agreement ("PPA") company through which Company A would be able to sell electricity without requiring its customers to purchase the company's proprietary hardware. At the time of their presentation, Badger and Daubenspeck were aware of Company A's planned uses for the funds raised through the offering.

11. At the time of Badger and Daubenspeck's presentation and throughout all of 2009, Company A was in "stealth mode," meaning that it provided little information to the public about its finances, operations or technology.

12. As part of their presentation, Badger and Daubenspeck told Company A that Advanced Equities hoped to complete the Series F offering during the month of January 2009 by raising all of the funds from a small number of high net-worth investors, each of whom could invest at least $20 million. They also agreed that the offering would require very little effort from Company A and would not disrupt Company A's business.

13. Advanced Equities and Company A reached an agreement in late December 2008 or early January 2009 to set the pre-money valuation of the Series F offering at $1.45 billion, meaning that the cost of each share of Company A stock purchased during the offering was $18.52.

14. In early January 2009, Advanced Equities began soliciting investors for direct investments in Company A.

15. By at least mid-January 2009, however, Advanced Equities, Badger and Daubenspeck realized that they needed to extend the timing of the offering and solicit investments of smaller dollar amounts from more potential investors in order to raise the entire $150 million.

16. Because Company A did not accept direct investments of less than $2 million, Advanced Equities established two limited liability companies (Greentech III and Greentech IV) on January 23, 2009 through which accredited investors and qualified purchasers could invest as little as $25,000 in Company A. Greentech III held investments from accredited investors and Greentech IV held investments from qualified purchasers.

17. As a condition to raising funds through Greentech III and Greentech IV, Advanced Equities, Badger and Daubenspeck agreed that Company A would not need to increase its involvement in the sales process or speak directly with any investors who indirectly invested in Company A through the Greentech funds.

4

18. Instead, Company A only agreed to meet or speak with investors who were willing to make direct investments of $2 million or more. As a result, Advanced Equities was the primary source of information about Company A and the offering for most of the firm's brokers and for the investors in Greentech III and Greentech IV.

19. Consistent with its "stealth mode" status, Company A expected Advanced Equities to focus its sales pitches on the promise of Company A's technology, management team and advisers and the progress it had made in its manufacturing process. Company A placed strict limitations on the amount and type of information that Advanced Equities could provide to investors, including requesting that Advanced Equities provide only very general information about Company A's finances and not share customer names or other proprietary information with investors in Greentech III and Greentech IV.

20. Company A also provided Advanced Equities with a two-page investment overview for potential investors in Greentech III and Greentech IV. The overview did not specify a specific dollar amount of order backlog and instead stated that Company A had a "significant backlog of signed contracts and LOIs [Letters of Intent]."

21. Unlike Advanced Equities' typical offerings during which its brokers passed information directly from the particular companies to investors, Badger took full control of the sales campaign for the 2009 offering on behalf of Company A and instructed Advanced Equities' brokers to have their customers call into presentations led by Badger so he could personally and directly present information about Company A to them.

22. Between approximately January 5 and March 27, 2009, Badger led at least 49 external investor presentations and at least five internal sales calls with Advanced Equities' brokers about the Company A offering.

23. Daubenspeck participated in two of the internal sales calls with Advanced Equities' brokers on February 2 and February 24, 2009, but did not participate in any of the external investor presentations.

24. In an email to one of Company A's board members on January 31, 2009, Badger described his conduct in the offerings as: "I have spoken to all of our prior investors personally. I have had over 200 one on one calls with investors myself. Every minute of my day for 3 and ½ weeks has been telling this story. All under NDA [non-disclosure agreement] with no financials, no info, just the basic story . . ."

25. The internal sales calls and external sales presentations were the primary source of information about Company A and the offering for most of Advanced Equities' brokers.

26. Daubenspeck and a small number of Advanced Equities' brokers and investment bankers (along with some of their direct investor customers) also traveled to Company A's headquarters for a presentation by Company A's CEO and CFO on January 13, 2009. As part of the presentation, Company A told the attendees about its current order backlog, including contracts for 17 systems from six customers (approximately $17 million). Company A also told the

5

attendees that it had conditional purchase orders for 15 systems from three customers (approximately $15 million), a Letter of Intent for 10 systems from one customer (approximately $10 million) and Letters of Intent for its proposed PPA company of $1.25 billion.

27. On or around January 14, 2009, when they returned to Chicago from the presentation at Company A's headquarters, Daubenspeck and the investment bankers provided Badger with information about the presentation.

28. Ultimately, between early January and late March 2009, Advanced Equities raised approximately $122 million from direct investors and the approximately 609 investors in Greentech III and Greentech IV. So far, there has been no liquidity event for this investment.

## **Misstatements About Company A**

29. Despite his up-to-date knowledge about Company A's operations and sales from participating in board of director meetings and the agreement to refrain from disclosing financial or other proprietary information during the offering, Badger made several misstatements about Company A's order backlog, customers and its application for a loan from the DOE during internal sales calls, external sales presentations and other communications with Advanced Equities' brokers and investors.

30. On January 20, 2009, in response to an email from brokers in Advanced Equities' New York office about an investor's concerns about the limited financial information contained in Company A's investor overview, Badger stated that Company A has "2,000 [units] from the CIA." The sale of 2,000 units would have been huge. An order that size would have generated approximately $2 billion in revenue for Company A. In reality, however, Company A did not have any orders, contracts or agreements with the CIA at that time.

### *February 2, 2009 Internal Sales Call*

31. On February 2, 2009, Badger and Daubenspeck presented information to Advanced Equities' brokers during an internal sales call.

32. During the call, Badger misstated that Company A's projected revenue of $2 billion "is currently under contract and backordered." In reality, Company A only had between $10 million and $42 million (10 to 42 individual hardware units) under contract as order backlog at that time.

33. During the February 2, 2009 call, Daubenspeck remained silent during Badger's misstatements and also misstated that Company A's CEO had shown him emails with a "$2 billion order from the CIA, which is not even in [Company A's] numbers." In reality, Company A did not have any order or other agreement from the CIA for any dollar amount at that time.

6

*February 24, 2009 Internal Sales Call*

34. On February 24, 2009, Badger and Daubenspeck presented information to Advanced Equities' brokers during an internal sales call.

35. During the call, Badger made the following misstatements:

a. Badger misstated that Company A had a "$1 billion contract" with a well-known national grocery store chain that he referred to by name. In reality, the national grocery store chain only had entered into a contract for two systems (approximately $2 million) and had expressed its interest in purchasing energy in the future through Company A's proposed PPA company through a non-binding letter of intent.

b. Badger misstated that Company A "was getting funded by the Department of Energy at 50 basis points over Treasuries" with "$300 million of revenue just from the Department of Energy loan guarantee." In reality, Company A had submitted an application in February 2009 for a $96.8 million loan from the Department of Energy, but had not received any funding yet or even an indication that its application would be granted.

36. During the February 24, 2009 call, Daubenspeck remained silent during Badger's misstatements.

*March 9, 2009 Internal Sales Call*

37. After attending Company A's March 3, 2009 board meeting, Badger presented information to Advanced Equities' brokers during an internal sales call.

38. During the call, Badger misstated again that Company A was "getting $300 million from the Department of Energy" when, in reality, Company A had not yet received any funding from the Department of Energy and had only applied for a $96.8 million loan.

*March 23, 2009 Internal Sales Call*

39. On March 23, 2009, approximately one week before the Series F offering ended, Badger presented information to Advanced Equities' brokers on another internal sales call.

40. During the call, Badger misstated that Company A had "over $1 billion in backlog from [a well-known national grocery store chain]." In reality, Company A did not have $1 billion in backlog from the national grocery store chain at that time.

### Misstatements To Investors In The Greentech Funds

41. During investor sales presentations between early January and late March 2009, Badger repeated certain of the misstatements that he had made during the internal sales calls. Among other things, Badger, and through him Advanced Equities, made the following misstatements:

> a. Badger told certain investors that Company A had an order backlog of $2 billion to $3 billion.
>
> b. Badger told certain investors that Company A had a $1 billion contract with a well-known national grocery store chain.
>
> c. Badger told certain investors that Company A was getting a loan of $270 million or that it had applied for a $300 million loan from the Department of Energy.
>
> d. Badger told certain investors that Company A had a $2 billion order from the CIA.

42. After hearing the misstatements from Badger, certain of Advanced Equities' brokers, including certain members of Advanced Equities' investment banking team and the broker-in-charge of Advanced Equities' New York branch office, repeated these misstatements to investors in email messages and telephone calls. Among other things, the brokers told investors that Company A had $2 billion or more in order backlog.

43. Certain of these brokers, including certain members of Advanced Equities' investment banking team and the broker-in-charge of Advanced Equities' New York branch office, were among the brokers who traveled to Company A's headquarters with Daubenspeck on January 13, 2009 and received additional information about Company A. As a result, these brokers knew or should have known that Badger's misstatements about Company A's backlog, grocery chain contract and its Department of Energy loan application were not true.

### Badger's Misstatements In 2010

44. In early 2010, Advanced Equities began soliciting prior investors to make additional investments in Company A through ten of Advanced Equities' limited liability companies, including Greentech III and Greentech IV, under the hope that Company A would accept the additional funds as an investment.

45. Between approximately February 2010 and March 2010, Advanced Equities raised an additional $47 million from prior investors and sent the money to Company A as an additional investment at the $1.45 billion valuation.

46. Badger led Advanced Equities' sales efforts and conducted several sales presentations with existing and potential investors, including an "update" call on March 5, 2010.

8

47. During the March 5, 2010 call, Badger misstated that Company A had applied for a $400 million loan from the Department of Energy and that the Department of Energy had approved Company A to "draw the first hundred million" on the loan. In reality, Company A only had applied for a $96.8 million loan from the Department of Energy and never had the ability to draw down any amount of the loan.

48. Ultimately, Company A declined to accept the $47 million and returned the money to Advanced Equities and the investors in late March 2010.

### Daubenspeck's Failure To Reasonably Supervise

49. Daubenspeck supervised Badger and had the ability and authority to affect Badger's conduct, including hiring and firing authority. Daubenspeck also had final approval for all management decisions within Advanced Equities.

50. In addition to Badger, Daubenspeck directly supervised Advanced Equities' investment bankers, all of whom were also brokers, and the broker-in-charge of Advanced Equities' New York office.

51. During the 2009 offering for Company A, Daubenspeck was the Advanced Equities employee primarily responsible for obtaining information from Company A, supervising the investment bankers in conducting due diligence for the offering and sharing information with Badger for use with Advanced Equities' brokers and investors.

52. Daubenspeck learned specific information about Company A during his attendance at Company A's December 4, 2008 and March 3, 2009 board of director meetings and the presentation at Company A's headquarters on January 13, 2009 and in other conversations with Company A's management and directors. As a result, Daubenspeck knew or should have known the correct amount of Company A's order backlog, the status and amount of its application for a loan from the Department of Energy and the names and amounts of customer orders.

53. On February 2, 2009, Daubenspeck participated in an internal sales call with Advanced Equities' brokers. During the course of the call, Daubenspeck remained silent after he heard Badger misstate that Company A's $2 billion in projected revenue was "under contract and backordered." Despite the red flags raised by Badger's misstatements during the internal call and the obvious risk that Badger's false information would be repeated to investors by Badger and Advanced Equities' brokers, Daubenspeck did not take reasonable steps to correct Badger's misstatements. Instead, through his silence, Daubenspeck failed reasonably to prevent Badger from conveying false information to the brokers and from continuing to make misstatements in future calls with Advanced Equities' brokers and investors.

54. Daubenspeck not only knew or should have known of Badger's misstatements on the February 2, 2009 call, but also helped add to the misinformation about Company A's order backlog by stating on the call that Company A's CEO had shown him emails with a "$2 billion order from the CIA, which is not even in [Company A's] numbers."

9

55. On February 24, 2009, Daubenspeck participated in another internal sales call with Advanced Equities' brokers. During the course of the call, Daubenspeck remained silent after he heard Badger misstate that Company A had a $1 billion contract with the well-known national grocery store chain and that Company A "was getting funded by the Department of Energy at 50 basis points over Treasuries" with "$300 million of revenue just from the Department of Energy loan guarantee." Despite the red flags raised by Badger's misstatements during the internal call and the obvious risk that Badger's false information would be repeated to investors by Badger and Advanced Equities' brokers, Daubenspeck did not take reasonable steps to correct Badger's misstatements. Instead, through his silence, Daubenspeck failed reasonably to prevent Badger from conveying false information to the brokers and from continuing to make misstatements in future calls with Advanced Equities' brokers and investors.

56. After hearing the misstatements on the two internal sales calls, Daubenspeck also failed to take reasonable steps to follow up with the investment bankers and the broker-in-charge of Advanced Equities' New York office to ensure that they did not repeat to investors Badger's misstatements or Daubenspeck's statement about the $2 billion CIA order. Instead, through his silence and failure to take reasonable steps in response to the red flags raised by Badger's conduct, Daubenspeck failed reasonably to prevent at least one of Advanced Equities' investment bankers and the broker-in-charge of the New York office from misstating the amount of Company A's backlog in communications with investors.

57. Had Daubenspeck taken reasonable steps in response to the red flags, it is likely that he could have prevented and detected Badger's and certain of the other brokers' violations of the antifraud provisions.

**<u>Violations</u>**

58. As a result of the conduct described above, Badger willfully[2] violated Sections 17(a)(2) and 17(a)(3) of the Securities Act which prohibit fraudulent conduct in the offer or sale of securities.

59. As a result of the conduct described above, Advanced Equities and certain of Advanced Equities' brokers willfully violated Sections 17(a)(2) and 17(a)(3) of the Securities Act which prohibit fraudulent conduct in the offer or sale of securities.

60. Section 15(b)(4)(E) of the Exchange Act allows for the imposition of a sanction against a broker or dealer who "has failed reasonably to supervise, with a view to preventing violations of the [federal securities laws], another person who commits such a violation, if such other person is subject to his supervision." Section 15(b)(6) incorporates by reference Section 15(b)(4)(E) and allows for the imposition of sanctions against persons associated with a broker or dealer for failing reasonably to supervise. The Commission has repeatedly emphasized that the duty to supervise is a critical component of the federal regulatory scheme. See, e.g., Merrill

---

[2] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)).

Lynch, Pierce, Fenner & Smith Inc., Exchange Act Rel. No. 63760 (Jan. 25, 2011) (citing Smith Barney, Harris Upham & Co. Inc., et al., Exchange Act Rel. No. 21813 (March 5, 1985)).

61. As a result of the conduct described above, Daubenspeck failed reasonably to supervise Badger and certain other brokers with a view to detecting and preventing Badger's and the other brokers' willful violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

## **Undertakings**

62. Advanced Equities undertakes to:

a. Retain, within 60 days of the date of the Order, at its own expense, the services of an Independent Consultant not unacceptable to the staff of the Division of Enforcement of the Commission (the "Commission staff"), to: (i) review the effectiveness of Advanced Equities' policies and procedures regarding sales practices, due diligence practices and supervisory procedures; (ii) review Advanced Equities' systems for implementing its policies and procedures; and (iii) make recommendations concerning these policies and procedures with a view to assuring compliance with the federal securities laws.

b. No later than ten (10) days following the date of the Independent Consultant's engagement, provide to the Commission staff a copy of the engagement letter detailing the Independent Consultant's responsibilities pursuant to paragraph 62.a above.

c. Require the Independent Consultant, at the conclusion of the review, which in no event shall be more than 120 days after the entry of the Order, to submit a report to Advanced Equities and the Commission staff. The report shall address the issues described in the Order and shall include a detailed description of the review performed, the conclusions reached, the Independent Consultant's recommendations for changes or improvements to the policies, procedures and practices of Advanced Equities and a procedure for implementing the recommended changes or improvements to such policies, procedures or practices.

d. Adopt, amend, implement and maintain all policies, procedures, and practices recommended in the report of the Independent Consultant within 180 days of the date of entry of the Order. As to any of the Independent Consultant's recommendations about which Advanced Equities and the Independent Consultant do not agree, such parties shall attempt in good faith to reach agreement within 210 days of the date of the entry of the Order. In the event that Advanced Equities and the Independent Consultant are unable to agree on an alternative proposal, Advanced Equities will abide by the determinations of the Independent Consultant and adopt those recommendations deemed appropriate by the Independent Consultant.

11

    e.    Retain the Independent Consultant to conduct a follow up review and submit a written Final Report to Advanced Equities and the Commission staff no later than one year after the date of entry of this Order. In the Final Report, the Independent Consultant shall address Advanced Equities' compliance with this Order, its implementation of the policies and procedures adopted under this Order and make any further recommendations he or she deems necessary. Within 30 days of its receipt of the Independent Consultant's Final Report, Advanced Equities shall adopt the recommendations contained in the Final Report.

    f.    Cooperate fully with the Independent Consultant in its review, including making such information and documents available as the Independent Consultant may reasonably request, and by permitting and requiring Advanced Equities' employees and agents to supply such information and documents as the Independent Consultant may reasonably request.

    g.    In order to ensure the independence of the Independent Consultant, Advanced Equities: (i) shall not have the authority to terminate the Independent Consultant without the prior written approval of the Commission staff; and (ii) shall compensate the Independent Consultant for services rendered pursuant to the Order at their reasonable and customary rates.

    h.    Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Advanced Equities, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Independent Consultant will require that any firm with which he or she is affiliated or of which he or she is a member, and any person engaged to assist the Independent Consultant in performance of his or her duties under this Order shall not, without prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Advanced Equities, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

    i.    Advanced Equities may apply to the Commission staff for an extension of the deadlines described above before their expiration, and upon a showing of good cause by Advanced Equities, the Commission staff may in its sole discretion, grant such extensions for whatever time period it deems appropriate.

63.    Advanced Equities further undertakes to:

    a.    Deliver, within 30 days of the entry of this Order, by certified U.S. mail, a copy of the Commission's Order in this matter to each customer of Advanced

Equities who invested in Company A at any time between January 1, 2009 and December 31, 2010.

b.  Implement, within 120 days of the entry of this Order, a new, internal training program covering sales practices and provide the Commission staff with a detailed description of the program within 5 days after its adoption.

c.  Use its best efforts to locate purchasers for any of its customers who purchased the securities of Company A through Greentech III or Greentech IV in 2009 and who wish to sell their securities at a price equivalent to their original purchase price.

d.  Post information concerning all of its future offerings on its password-protected Venture Gateway system or any successor systems. Advanced Equities will obtain approval from the chief executive officer or chief financial officer of each company for which Advanced Equities is conducting an offering of all information posted on the Venture Gateway system, including all financial information received by Advanced Equities. All presentations and other information posted on the Venture Gateway system will be maintained and preserved in accordance with the requirements of Rule 17a-4 under the Exchange Act for at least four (4) years.

e.  Cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, Advanced Equities has undertaken:

>   1.  To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission staff, with a custodian declaration as to their authenticity, if requested;
>
>   2.  To use its best efforts to cause Advanced Equities' current and former employees to be interviewed by the Commission staff at such times and places as the staff reasonably may direct. Live interviews on one week's notice or telephone interviews on 72 hours' notice, at the option of the option of the staff, shall be deemed to be reasonable;
>
>   3.  To use its best efforts to cause Advanced Equities' employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be reasonably requested by the Commission staff; and
>
>   4.  In connection with any interviews of Advanced Equities' employees to be conducted pursuant to this undertaking, requests for such interviews may be provided by the Commission staff to its General Counsel, Advanced Equities, Inc., 311 South Wacker Drive, Suite 6150, Chicago, Illinois 60606, or such other counsel that may be substituted by Advanced Equities.

64. Advanced Equities shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to Anne C. McKinley, Assistant Regional Director, Chicago Regional Office, 175 W. Jackson Blvd., Suite 900, Chicago, Illinois 60604, with a copy to the Office of Chief Counsel of the Division of Enforcement, 100 F Street, NE, Washington, DC 20549 no later than sixty (60) days from the date of the completion of the undertakings.

65. Daubenspeck shall provide to the Commission, within 15 days after the end of the twelve month suspension period described below, an affidavit that he has complied fully with the sanctions described in Section IV below.

66. Daubenspeck shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, Daubenspeck has undertaken:

>1. To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission staff, with a custodian declaration as to their authenticity, if requested;
>
>2. To appear and be interviewed by the Commission staff at such times and places as the staff reasonably may direct. Live interviews on one week's notice or telephone interviews on 72 hours' notice, at the option of the staff, shall be deemed to be reasonable;
>
>3. To appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be reasonably requested by the Commission's staff; and
>
>4. In connection with any interviews or testimony to be conducted pursuant to this undertaking, requests for such interviews or testimony may be provided by the Commission staff to his attorney, Steven S. Scholes, McDermott, Will & Emery, 227 West Monroe Street, Chicago, Illinois 60606, or such other counsel that may be substituted by Daubenspeck.

In determining whether to accept Advanced Equities' and Daubenspeck's Offers, the Commission has considered Advanced Equities' undertakings in paragraphs 63.a-e and Daubenspeck's undertakings in paragraph 66, above.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in the Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Section 15(b) of the Exchange Act and Sections 203(e) and 203(f) of the Investment Advisers Act it is hereby ORDERED that**:**

A.  Advanced Equities

1. Respondent Advanced Equities shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

2. Respondent Advanced Equities is censured.

3. Respondent Advanced Equities shall, within 30 days of the entry of this Order, pay a civil money penalty of $1,000,000 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717. Payment must be made in one of the following ways:

   (1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

   (2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

   (3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand delivered or mailed to:

   Enterprise Services Center
   Accounts Receivable Branch
   HQ Bldg., Room 181, AMZ-341
   6500 South MacArthur Boulevard
   Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Advanced Equities, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Robert J. Burson, Senior Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 175 West Jackson Blvd., Suite 900, Chicago, Illinois 60604.

4. Respondent Advanced Equities shall comply with the undertakings enumerated in Section III, paragraphs 62.a-i and 64, above.

B. Badger

1. Respondent Badger shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

2. Respondent Badger be, and hereby is, barred from association with any broker, dealer, investment adviser, municipal securities dealer or transfer agent with the right to reapply for reentry after one (1) year to the appropriate self-regulatory organization, or if there is none, to the Commission.

3. Any reapplication for association by Respondent Badger will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

4. Respondent Badger shall pay a civil money penalty in the amount of $100,000 to the United States Treasury. Payment shall be made in the following installments: $30,000 to be paid within thirty (30) days after entry of this Order and the remaining $70,000 to be paid in ten (10) equal installments of $7,000 on the last day of each month from October 31, 2012 until July 31, 2013. If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of civil penalties, plus any additional interest accrued pursuant to 31 U.S.C. 3717, shall be due and payable immediately, without further application. Payments must be made in one of the following ways:

(1) Respondent may transmit payments electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payments from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Dwight O. Badger as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Robert J. Burson, Senior Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 175 West Jackson Blvd., Suite 900, Chicago, Illinois 60604.

C. <u>Daubenspeck</u>

1. Respondent Daubenspeck be, and hereby is, suspended from association in a supervisory capacity with any broker, dealer, investment adviser, municipal securities dealer or transfer agent for a period of twelve (12) months, effective on the second Monday following the entry of this Order.

2. Respondent Daubenspeck, shall, within thirty (30) days of the entry of this Order, pay a civil money penalty in the amount of $50,000 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717. Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

17

Payments by check or money order must be accompanied by a cover letter identifying Keith G. Daubenspeck as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Robert J. Burson, Senior Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 175 West Jackson Blvd., Suite 900, Chicago, Illinois 60604.

3.      Respondent Daubenspeck shall comply with the undertaking enumerated in Section III, paragraph 65, above.

By the Commission.

Elizabeth M. Murphy<br>Secretary