# EXHIBIT C

### BLOOM ENERGY CORPORATION

### SECURITIES ACQUISITION AGREEMENT

This Securities Acquisition Agreement (this "***Agreement***") is made and entered into as of June 27, 2014, 2014, (the "***Effective Date***") by and among Keith Daubenspeck, resident of Illinois ("***Daubenspeck***"), Dwight Badger, resident of Illinois ("***Badger***", with each of Daubenspeck and Badger being individually referred to herein as an "***Acquirer***" and together referred to as the "***Acquirers***") and Bloom Energy Corporation, a Delaware corporation (the "***Company***").

**WHEREAS**, pursuant to the terms of, and in exchange for the releases, covenants, and other consideration provided in, that certain Confidential Agreement, dated as of the Effective Date, by and among the Company, the Acquirers, and certain other parties (the "***Confidential Agreement***"), the Company has promised to issue the Acquirers (a) up to an aggregate of 400,000 shares of the Company's Series G Preferred Stock (or Common Stock as set forth herein) in three (3) separate issuances, (b) warrants exercisable for an aggregate of 400,000 shares of the Company's Series G Preferred Stock, and (c) warrants exercisable for an aggregate of 50,000 shares of the Company's Common Stock, with the aforementioned securities to be issued to each Acquirer according to the allocations set forth opposite such Acquirer's name on **Exhibit 1** hereto and in accordance with Section 1 hereof.

**WHEREAS**, as a condition precedent to the Company issuing the securities described in the foregoing recital and herein to Acquirers and Acquirers receiving such securities from the Company, and in accordance with the terms of the Confidential Agreement, each of the Acquirers have agreed to execute this Agreement to confirm, acknowledge, and agree that such securities, when issued in accordance with the terms provided herein, are bound by the terms, conditions, obligations, and restrictions further described herein.

**NOW, THEREFORE**, the parties hereby agree as follows.

1.     **ISSUANCE OF SECURITIES.**

    1.1     **Timing of Issuances.**

        **(a)**     **Initial Issuance.** On the Effective Date, and subject to the terms and conditions of this Agreement, including satisfaction of the conditions in <u>Section 1.2</u> below, the Company shall issue to the Acquirers an aggregate of 100,000 shares of the Company's Series G Preferred Stock (such issuance, the "***Initial Issuance***" and, such shares, the "***Initial Shares***"), represented by a stock certificate issued in each Acquirer's name for the number of Initial Shares set forth opposite such Acquirer's name on **Exhibit 1** hereto.

        **(b)**     **Second Issuance.** Upon the earlier to occur of (i) the first anniversary of the Effective Date (the "***Anniversary***") or (ii) a Liquidation (as defined below), then, subject to the terms and conditions of this Agreement and the terms of Section 10 of the Confidential Agreement, including satisfaction of the conditions in <u>Section 1.2</u> below, the Company shall (A) in the case of (i), within ten (10) days after the Anniversary or (B), in the case of (ii), immediately prior to, and conditioned upon, the consummation of a Liquidation,

issue to Acquirers an aggregate of 100,000 shares of the Company's Series G Preferred Stock (such issuance, the *"Second Issuance"*, and such shares, the *"Second Shares"*) represented by a stock certificate issued in each Acquirer's name for the number of Second Shares set forth opposite such Acquirer's name on **Exhibit 1** hereto.

(c)     **Third Issuance.**  Upon the earlier to occur of (i) the expiration of the Standoff Period (as defined below) or (ii) a Liquidation, then, subject to the terms and conditions of this Agreement and the terms of Section 10 of the Confidential Agreement, including satisfaction of the conditions in Section 1.2 below, the Company shall (A) in the case of (i), within ten (10) days prior to the expiration of the Standoff Period or (B), in the case of (ii), immediately prior to, and conditioned upon, the consummation of a Liquidation, issue to Acquirers an aggregate of 200,000 shares of the Company's Series G Preferred Stock (such issuance, the "*Third Issuance*", and such shares, the "*Third Shares*") represented by a stock certificate issued in each Acquirer's name for the number of Third Shares set forth opposite such Acquirer's name on **Exhibit 1** hereto.  The Company may elect to issue any or all of the Third Shares at any time to enforce its rights under the Note and Security Agreement, in which case the Acquirers shall be required to deliver the instruments required of them under Section 1.2 hereof.

(d)     **Warrant Issuance.**  On the Effective Date, and subject to the terms and conditions of this Agreement, including satisfaction of the conditions in Section 1.2 below, the Company shall issue to Acquirers:

(i)     Warrants to purchase an aggregate of 400,000 shares (the "*Series G Warrant Shares*") of the Company's Series G Preferred Stock at an exercise price per share equal to $25.76 in the form attached hereto as **Exhibit 2** (the "*Series G Warrants*"), with each Acquirer to receive a Series G Warrant exercisable for the number of Series G Warrant Shares set forth opposite such Acquirer's name on **Exhibit 1** hereto (the "*Series G Warrant Issuance*").

(ii)     Warrants to purchase an aggregate of 50,000 shares (the "*Common Warrant Shares*" and, together with the Series G Warrant Shares, the "*Warrant Shares*") of the Company's Common Stock at an exercise price per share equal to $25.76 in the form attached hereto as **Exhibit 3** (the "*Common Warrants*" and, together with the Series G Warrants, the "*Warrants*"), with each Acquirer to receive a Common Warrant exercisable for the number of Common Warrant Shares set forth opposite such Acquirer's name on **Exhibit 1** hereto (the "*Common Warrant Issuance*").  The issuance of the Warrants is referred to herein as the "*Warrant Issuance*."

(e)     **Defined Terms.**  For purposes of this Agreement:

(i)     The term "*Applicable Law*" shall mean any federal, state, foreign, local, municipal or other law, statute, constitution, legislation, principle of common law, resolution, ordinance, code, edict, decree, rule, directive, license, permit, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any governmental entity and any orders applicable to the Company, Acquirers or to any matter contemplated or referred to in this Agreement.

Bates #: Claimants' 0030

(ii)     The term "***Indemnification Obligations***" shall refer to the obligations of the Acquirers to indemnify the Company for certain matters, as set forth in Section 10 of the Confidential Agreement, and to the corresponding restrictions on the possession, sale, transfer, assignment, pledge, or disposition of or encumbrance on all or any portion of any of the Securities provided pursuant to the terms of such provisions in the Confidential Agreement.

(iii)     The Initial Issuance, the Second Issuance, the Third Issuance, and the Warrant Issuance are occasionally referred to herein separately as an "***Issuance***" and collectively referred to herein as the "***Issuances***".

(iv)     The term "***Liquidation***" shall have the meaning given to such term in the Company's Certificate of Incorporation, as the same may be amended from time to time (the "***Charter***"), or, if such term is not defined in the Company's Charter, it shall have the meaning given to such term the last time such term was defined in the Charter.

(v)     The term "***Security Obligations***" shall refer to the restrictions on the possession, sale, transfer, assignment, pledge, or disposition of or encumbrance (including the security interest granted therein) on all or any portion of any of the Securities provided pursuant to the terms of that certain Security Agreement (the "***Security Agreement***") delivered by the Acquirers to the Company hereof as Exhibit 1 to that certain Secured Promissory Note, dated as of the Effective Date, by and between the Company and the "Borrowers" named therein (the "***Note***").

(vi)     The Initial Shares, the Second Shares, and the Third Shares, and any shares of the Company's capital stock issued upon conversion or adjustment of any of the foregoing are collectively referred to herein as the "***Shares***".  The Shares issuable at each Issuance are subject to adjustment as provided in Section 1.4 below.

(vii)     the Shares, the Warrants, and any shares of the Company's capital stock issued upon exercise of a Warrant or issued upon conversion or adjustment of any of the Company's capital stock issued upon exercise of a Warrant are collectively referred to herein as the "***Securities***".  The Securities subject to the Warrants shall be subject to adjustment as provided in the Warrants.

(viii)     the Confidential Agreement, the Note, the Security Agreement, the Warrants, and this Agreement are collectively referred to herein as the "***Settlement Agreements***."

(ix)     the term "***Transfer Restrictions***" shall refer to the restrictions on the possession, sale, transfer, assignment, pledge, or disposition of or encumbrance on all or any portion of any of the Securities provided pursuant to the terms of Sections 3 and 4 of this Agreement.

**1.2     Conditions to Initial Issuance and Warrant Issuance; Covenants regarding Voting Agreement and Registration Rights Agreement.** As a condition precedent to the First Issuance and the Warrant Issuance, on the Effective Date, each Acquirer shall deliver to the Company a duly executed copy of this Agreement together with the Stock Power), the Note and the Security Agreement (and the documents required therein).  If and when the

Company and the other parties to that certain Eighth Amended and Restated Voting Agreement dated June 30, 2011 (the "***Voting Agreement***"), determine to amend or restate the Voting Agreement, the Company and the Acquirers agree to add the Acquirers as parties thereto. Furthermore, if and when the Company and the other parties to that certain Eighth Amended and Restated Registration Rights Agreement dated June 30, 2011 (the "***Registration Rights Agreement***"), determine to amend or restate the Registration Rights Agreement, the Company and the Acquirers agree to add the Acquirers as parties thereto for the limited purpose of allowing them to participate in the piggyback registration rights provided therein with respect to the shares of Common Stock issuable upon conversion of the shares of Series G Preferred Stock acquired by them.

       **1.3**    <u>**Conditions to Second Issuance and Third Issuance.**</u>  As a condition precedent to the Second Issuance and the Third Issuance and each Acquirer receiving any of the Securities in each such Issuance (and, in the case any of the following conditions is not met or satisfied, or waived by the Company in writing, the Second Issuance and the Third Issuance shall not occur until such time as all of the following conditions are met):

       **(a)**    The representations and warranties of the Acquirers contained in <u>Section 2</u> hereof shall be true and complete on the date of the Second Issuance and the Third Issuance, as the case may be, with the same effect as though such representations and warranties had been made on and as of the Effective Date and each Acquirer shall have separately certified same.

       **(b)**    Each of the Acquirers shall have performed and be in compliance with, and shall not have breached, the terms, agreements, obligations, and conditions of any of the Settlement Agreements and each Acquirer shall each have separately certified the same.

       **(c)**    (i) There shall not exist any breach of any of the terms of the Confidential Agreement by any of the Plaintiffs (as defined in the Confidential Agreement) or any dispute regarding the terms, agreements, obligations, and conditions of the Confidential Agreement, (ii) there shall not be any pending claims for indemnification made by any Released Person (as defined in the Confidential Agreement) pursuant to Section 10 of the Confidential Agreement, and (iii) there shall not exist any Event of Default (as defined in the Note).

       **(d)**    Each of the Second Issuance and the Third Issuance shall not violate any Applicable Law, shall be exempt from the registration requirements of the Law (as defined below), and shall be issued pursuant to a valid and available exemption or exemptions from the registration and qualification requirements of the 1933 Act, the CA Law (as defined below), or any other Applicable Law.

       **(e)**    Each Acquirer shall deliver to the Company on or prior to the date of the Second Issuance or the Third Issuance, as the case may be:

           **(i)**    an executed Securities Power and Assignment Separate from Stock Certificate (with the date and number of shares left blank), in substantially the form attached hereto as **<u>Exhibit 4</u>** (a "***Securities Power***"), executed by such Acquirer, which Securities Power may be utilized by the Company to enforce any Indemnification Obligations,

4

Security Obligations, or the Right of First Refusal, in each case as determined by the Company; and

> **(ii)** a certificate, in substantially the form attached hereto as **<u>Exhibit 5</u>** (an "***Issuance Certificate***"), duly completed, executed and notarized by such Acquirer certifying that the conditions requiring certification pursuant to this <u>Section 1.3</u> have been fulfilled and acknowledging and agreeing that the Securities being issued in such Issuance are subject to the Transfer Restrictions and the other restrictions set forth herein.

If the Company determines to not issue Shares at either the Second Issuance or Third Issuance, it will so notify the Acquirers no less than five (5) business days prior to the date of the Second Issuance or Third Issuance, as applicable, which notice will state the basis for the Company's determination not to issue the relevant Shares.

> **1.4**   **<u>Adjustment Provisions for Shares</u>.**  In addition to what is provided in this Agreement, the number and character of the Shares issuable pursuant to this Agreement are subject to adjustment upon each event described in this Section 1.4 prior to the issuance of such Shares:

> **(a)**   <u>Adjustment for Stock Splits and Stock Dividends.</u>  The number of the Shares shall be proportionally adjusted to reflect any stock dividend, stock split, reverse stock split or other similar event affecting the number of outstanding shares of the equivalent class and series of the Company's capital stock, to the extent such stock dividend, stock split, reverse stock split or other similar event occurs after the Effective Date but prior to the applicable Issuance.

> **(b)**   <u>Adjustment for Reorganization, Consolidation, Merger</u>.  (a) In case of any recapitalization or reorganization of the Company or (b) in case the Company shall consolidate with or merge into one or more other corporations or entities which results in a change of the Shares outstanding shares of the equivalent class and series of the Company's capital stock, which, in the case of (a) or (b) is not a Liquidation (each, a "***Reorganization Event***"), then, and in each such case, each Acquirer, upon an applicable Issuance shall be entitled to receive, in lieu of the stock or other securities and property that such Acquirer would have been entitled to receive prior to such Issuance prior to such Reorganization Event, the stock or other securities or property which such Acquirer would have been entitled to receive upon such Reorganization Event if, immediately prior to such Reorganization Event, such Acquirer had received the Shares issuable upon such Issuance, as applicable, all subject to further adjustment as provided in this Agreement.  If after such Reorganization Event, the Securities issuable to an Acquirer are for securities of a corporation or entity other than the Company, then such corporation or entity shall duly execute and deliver to each Acquirer a supplement hereto acknowledging such corporation's or other entity's obligations under this Agreement; and in each such case, the terms of this Agreement shall be applicable to the shares of stock or other securities or property receivable pursuant to this Agreement after the consummation of such Reorganization Event.

> **(c)**   <u>Conversion of Stock</u>.  In case all (a) the Series G Preferred Stock is converted, pursuant to the Company's Certificate of Incorporation, into Common Stock or other securities or property, or (b) the Series G Preferred Stock otherwise ceases to exist or to be

authorized by the Company's Certificate of Incorporation (each, a "***Stock Event***"), then each Acquirer, at the time of any remaining Issuances at any time after such Stock Event, shall receive, in lieu of the number of shares of Shares, as applicable, that would have been issuable at such Issuance immediately prior to such Stock Event, the stock and other securities and property that such Acquirer would have been entitled to receive upon the Stock Event, if, immediately prior to such Stock Event, Acquirer had received the Shares issuable in such Issuance.

       **2.**     <u>**REPRESENTATIONS AND WARRANTIES OF ACQUIRERS**</u>.  Each Acquirer represents and warrants to Company on the Effective Date and as of the date of the Second Issuance and the Third Issuance as follows:

       **2.1**     <u>**Acquisition for Own Account for Investment**</u>.  Acquirer is acquiring the Securities for Acquirer's own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Securities within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Acquirer has no present intention of selling or otherwise disposing of all or any portion of the Securities and no one other than Acquirer has any beneficial ownership of any of the Securities.

       **2.2**     <u>**Accredited Investor; Acquirer's Qualifications**</u>.  Acquirer is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act. The residency of the Acquirer is correctly set forth on the signature to this Agreement.  Acquirer either alone or with Acquirer's representative(s) (as defined in Rule 501(h) of Regulation D, promulgated under the 1933 Act), has such knowledge and experience in financial and business matters that Acquirer is capable of evaluating the merits and risks of this prospective investment, has the capacity to protect Acquirer's own interests in connection with this transaction**,** and is financially capable of bearing a total loss of the Securities.

       **2.3**     <u>**Acknowledgment**</u>.  Each Acquirer acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, attorneys, or agents (a) have made any representations or warranties of any kind, express or implied, to such Acquirer or their respective agents in connection with the acquisition of the Securities by such Acquirer, other than the representations and warranties contained in the Confidential Agreement or (b) have at any time had any duty to such Acquirer or his respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the acquisition of the Securities by Acquirer.

       **2.4**     <u>**Sophisticated Acquirer**</u>.  Acquirer (a) is a sophisticated party familiar with transactions similar to those contemplated by this Agreement, (b) has all information that Acquirer considers important in making the decision to acquire the Securities and to make an informed decision regarding the acquisition of the Securities, and (c) has independently, and based on such information and the advice of such advisors as Acquirer has deemed appropriate, made its own analysis and decision to enter into this Agreement.  Acquirer understands that the Company will rely on the accuracy and truth of the foregoing representations, and Acquirer hereby consents to such reliance.

       **2.5**     <u>**Understanding of Risks**</u>.  Acquirer is fully aware of: (a) the highly speculative nature of the Securities; (b) the financial hazards involved; (c) the fact that no public

market now exists for any of the Securities and that the Company has made no assurances that a public market will ever exist for the Company's securities; (d) the lack of liquidity of the Securities and the Transfer Restrictions, Indemnification Obligations, and the Security Obligations (which, for example, may prevent Acquirer from being able to sell or dispose of the Securities or use the Securities as collateral for loans); and (e) the qualifications and backgrounds of the management of the Company.

      **2.6**    <u>**Tax Liability.**</u>  Acquirer has reviewed with Acquirer's own legal and tax advisors the federal, state, local, and any other applicable tax consequences associated with Acquirer acquiring the Securities on the Effective Date and at the time of the Second Issuance and the Third Issuance. Acquirer has relied solely on such advisors and has not received any advice from the Company or any of its agents regarding the legal and tax consequences associated with Acquirer entering into this Agreement or the consummation of the transactions contemplated hereby. Acquirer understands that Acquirer (and not the Company) shall be responsible for its own tax liability that may arise as a result of Acquirer acquiring or disposing of the Securities and has chosen to proceed with the transactions contemplated by this Agreement and the Warrants with this understanding.

      **2.7**    <u>**Compliance with Securities Laws**</u>. Acquirer understands and acknowledges that, in reliance upon the representations and warranties made by Acquirer herein, the Securities are not being registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or being qualified under the California Corporate Securities Law of 1968, as amended (the "*CA Law*") or other Applicable Law, but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the 1933 Act, the CA Law, or other Applicable Law which impose certain restrictions on Acquirer's ability to transfer the Securities.

      **2.8**    <u>**Securities Law Restrictions on Transfer**</u>. Acquirer understands that Acquirer may not transfer any Securities unless such Securities are registered under the 1933 Act or qualified under the CA Law or other Applicable Law or unless, in the opinion of counsel to the Company, exemptions from such registration and qualification requirements are available. Acquirer understands that only the Company may file a registration statement with the SEC or the California Commissioner of Corporations or other applicable securities commissioners and that the Company is under no obligation to do so with respect to the Securities. Acquirer has also been advised that exemptions from registration and qualification may not be available or may not permit Acquirer to transfer all or any of the Securities in the amounts or at the times proposed by Acquirer.

      **2.9**    <u>**Rule 144.**</u>  Acquirer acknowledges that, because the Securities have not been registered under the 1933 Act, the Securities must be held indefinitely unless subsequently registered under the 1933 Act or unless an exemption from such registration is available. Acquirer is aware of the provisions of Rule 144 promulgated under the 1933 Act.

      **2.10**    <u>**No Information Rights**</u>. Acquirer agrees, acknowledges and confirms that nothing in this Agreement shall be construed to provide Acquirer with any rights to information regarding the Company and its present and prospective business, assets, liabilities and financial condition, whether at the time of effectiveness of this Agreement, upon any

Bates #: Claimants' 0035

Issuance, any time after any Issuance, or any other time.  Acquirer further agrees, acknowledges, and confirms that the terms of the AEI Side Letters (as defined in the Confidential Agreement), Section 220 of the Delaware General Corporation Law, or any other similar agreements or laws, regulations, or provisions, shall not be applicable to Acquirer or the Securities, regardless whether Acquirer was previously a party to such agreements or the number of Securities held by Acquirer otherwise qualifies Acquirer to receive information pursuant to such agreements and provisions.

###   3.   RESTRICTIONS ON TRANSFER; COMPANY'S RIGHT OF FIRST REFUSAL.

####   3.1   Restrictions on Transfer.

**(a)**   Transfer Prohibition.  Unless the Company provides prior written consent, each Acquirer agrees, acknowledges, and confirms that such Acquirer shall not sell, transfer, assign or otherwise dispose of all or any portion of:

**(i)**   The Warrants or any rights thereunder.

**(ii)**   The Initial Shares or any interest therein until the earlier to occur of (a) the period for the Initial Shares Proposed Purchase (as defined in the Confidential Agreement) has expired, (b) the consummation of a Liquidation, (c) the expiration of the Standoff Period (as defined below) under Section 4.1 hereof (or any successor arrangement or agreement), or (d) such time as the Initial Shares have been registered for sale under the 1933 Act.

**(iii)**   The Second Shares or any interest therein until the earlier to occur of (a) the period for the Second Shares Proposed Purchase (as defined in the Confidential Agreement) has expired, (b) the consummation of a Liquidation, (c) the expiration of the Standoff Period under Section 4.1 hereof (or any successor arrangement or agreement), or (d) such time as the Second Shares have been registered for sale under the 1933 Act.

**(iv)**   The Third Shares, any of the Securities issued upon exercise of the Warrants, or any interest therein until such time as such Securities are released as "Collateral" pursuant to the terms of the Security Agreement, provided, however, that, prior to or in connection with such release, one of the following has occurred: (A) a Liquidation has been consummated in which the consideration payable to the stockholders of the Company consists of cash or publicly tradeable securities and in connection therewith, the "Obligations" as defined in the Security Agreement have been paid and satisfied in full, (B) the Standoff Period under Section 4.1 hereof (or any successor arrangement or agreement) has expired, or (C) such Securities have been registered for sale under the 1933 Act.

For clarity, the transfer restrictions in this Section 3 shall not apply to transfers of the Securities to the Company pursuant to the terms of the Confidential Agreement or pursuant to exercise of rights of the Company to dispose of Securities constituting Collateral under the Security Agreement and the UCC.  Moreover, the transfer restrictions in this Section are in addition to those set forth in Section 10(b)(iv) of the Confidential Agreement and any transfer restrictions set forth in the Security Agreement, which restrictions prohibit, among other things, the pledging

or encumbering of the Securities.

**(b)**     General Restrictions.

**(i)**     Applicability of Restrictions.  The Acquirers will cause any proposed purchaser, or transferee of the Securities held by an Acquirer to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement and the Warrants, as applicable.  Furthermore, Acquirer agrees, confirms, and acknowledges that any transferee, assignee, or successor in interest of any Securities held by an Acquirer, directly or indirectly, shall acknowledge that such person shall not receive any rights to information regarding the Company and its present and prospective business, assets, liabilities and financial condition, including under Section 220 of the Delaware General Corporation Law, and the agreement (in a writing with the Company) of such transferee, assignee, or successor in interest shall be required to agree to the foregoing as a condition to the effectiveness of such transfer, assignment, or succession.

**(ii)**     Procedures.  Before any Acquirer seeks to consummate a proposed sale, assignment, disposition, encumbrance, or transfer of any of the Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction, such Acquirer shall give notice to the Company of Acquirer's intention to effect such sale, pledge, assignment, disposition, encumbrance or transfer.  Each such notice shall describe the manner and circumstances of the proposed sale, assignment, disposition, or transfer in sufficient detail and, if requested by the Company, shall be accompanied at such Acquirer's expense by either (a) a written opinion of legal counsel who shall, and whose legal opinion shall, be satisfactory to the Company in its sole discretion, addressed to the Company, to the effect that the proposed transaction may be effected without registration or qualification under the 1933 Act, the Law, and any other Applicable Law; (b) a "no action" letter from the SEC to the effect that the proposed sale or transfer of such Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (c) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale or transfer of the Securities may be effected without registration or qualification under the 1933 Act, CA Law, and any other Applicable Law, whereupon such Acquirer shall be entitled to sell, assign, dispose of or transfer such Securities in accordance with the terms of the notice given by such Acquirer to the Company, subject to the Company's Right of First Refusal (as defined below).  Until the IPO and the expiration of the Standoff Period under Section 4 hereof (or any successor arrangement or agreement), the Acquirers shall not transfer any Securities to any person or entity that is determined to be a competitor of the Company, in the good faith judgment of the Company's Board of Directors.

**3.2     Company's Right of First Refusal**.  Subject to the provisions and prohibitions of Section 3.1 hereof, before any Securities held by the Acquirers or any transferee (either being sometimes referred to herein as the "***Holder***") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Securities on the terms and conditions set forth in this Section (the "***Right of First Refusal***").

**(a)**  Notice of Proposed Transfer.  The Holder of the Securities shall deliver to the Company a written notice (the "*Notice*") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Securities; (ii) the name of each proposed transferee ("*Proposed Transferee*"); (iii) the number and type of Securities to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Securities (the "*Offered Price*"), and the Holder shall offer the Securities at the Offered Price to the Company or its assignee(s).

**(b)**  Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Securities proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

**(c)**  Purchase Price.  The purchase price ("*ROFR Purchase Price*") for the Securities purchased by the Company or its assignee(s) under this Section shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

**(d)**  Payment.  Payment of the ROFR Purchase Price shall be made by the Company or its assignee(s) in cash (by check or wire of immediately available funds) within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

**(e)**  Holder's Right to Transfer.  If any or all of the Securities proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Securities to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any Applicable Law and that the Proposed Transferee agrees in writing that the provisions of this Agreement shall continue to apply to the Securities in the hands of such Proposed Transferee, except that the Securities after such transfer will not be held in escrow. If the Securities described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Securities held by the Holder may be sold or otherwise transferred.

**(f)**  Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Securities upon the IPO.

**4.**      **LOCK-UP AGREEMENT; LEGENDS; ESCROW.**

    **4.1**      **Lock-up Agreement.**  By signing below, each Acquirer hereby agrees, confirms, and acknowledges that each Acquirer and the Securities held by such Acquirer at such time shall be subject to and bound by the terms, conditions, and limitations of the "Lock-up Agreement" in Section 10 of the Registration Rights Agreement, as the same may be amended from time to time, as if such Acquirer were a "Holder" of "Registrable Securities" under the

Bates #: Claimants' 0038

Registration Rights Agreement (the "***Lock-Up Agreement***").  In order to enforce the foregoing covenant, the Company shall have the right to place restrictive legends on the certificates representing the securities subject to this Section and the Lock-Up Agreement and to impose stop transfer instructions with respect to the Securities until the end of such period.  For purposes of this Agreement:

        **(a)**    "***IPO***" means the Company's first registration of the Company's securities under the 1933 Act.

        **(b)**    "***Standoff Period***" means the period commencing on the IPO and terminating on the expiration of the Lock-Up Agreement.

        **4.2**    **Escrow**.  As security for Acquirer's faithful performance of this Agreement and of the Acquirer's faithful performance of the Indemnification Obligations under the Confidential Agreement and, in the case of the Third Shares and the Warrants, the Security Obligations under the Security Agreement, each Acquirer has executed (or will execute) a Securities Power each issuance of Securities.  Immediately upon issuance of Securities, including upon exercise of any of the Warrants, in connection with any conversion of the originally issued Securities, or in connection with adjustments under Section 1.4 hereof or the terms of the Warrants, and as may be further required pursuant to the Confidential Agreement and Security Agreement, each instrument or certificate evidencing Securities will be held by the Secretary of the Company or other designee of the Company ("***Escrow Holder***"), who is hereby appointed to hold such instrument or certificate and Securities Power in escrow and to take all such actions and to effectuate all such transfers and/or releases of such Securities as are in accordance with the terms of this Agreement.  Each Acquirer and the Company agree that Escrow Holder will not be liable to any party to the Settlement Agreements (or to any other person or entity) for any actions or omissions unless Escrow Holder is grossly negligent or intentionally fraudulent in carrying out the duties of Escrow Holder under this Section.  Escrow Holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may rely on the advice of counsel and obey any order of any court with respect to the transactions contemplated by this Agreement.  The Securities will be released from escrow upon the earlier of (i) the sale of such Securities to a third party as permitted by the terms of the Settlement Agreements or (ii) termination of the Transfer Restrictions, Indemnification Obligations, and Security Obligations applicable to such Securities.

        **4.3**    **Legends**.  Unless otherwise agreed by the Company, each Acquirer understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) or other instruments evidencing the Securities, together with any other legends that may be required by (a) any Applicable Law, (b) the Company's Certificate of Incorporation and/or Bylaws, (c) any other agreement affecting the Securities between such Acquirer and the Company, or between such Acquirer and any third party known to the Company, or (d) any other agreement applicable to such Acquirer:

        THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED

UNLESS AND UNTIL REGISTERED UNDER THE ACT AND QUALIFIED OR EXEMPTED FROM QUALIFICATION UNDER ALL APPLICABLE BLUE SKY LAWS, OR, IN THE OPINION OF LEGAL COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SECURITIES.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT ARE SUBJECT TO A LOCK-UP PERIOD OF UP TO 180 DAYS FOLLOWING THE EFFECTIVE DATE OF A REGISTRATION STATEMENT OF THE COMPANY FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY. SUCH LOCK-UP PERIOD IS BINDING ON THE TRANSFEREES OF THESE SECURITIES.

*[IN THE CASE OF THE THIRD SHARES AND THE WARRANTS ONLY:]* THE SHARES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT ARE SECURITY FOR CERTAIN INDEBTEDNESS OBLIGATIONS OF THE HOLDER PURSUANT TO THE TERMS OF A NOTE AND SECURITY AGREEMENT BETWEEN THE HOLDER AND THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER PURSUANT TO THE TERMS OF THE AFOREMENTIONED AGREEMENTS. A COPY OF SUCH AGREEMENTS MAY BE OBTAINED FROM THE COMPANY.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT ARE SECURITY FOR CERTAIN INDEMNIFICATION OBLIGATIONS OF THE HOLDER ON THE TERMS SET FORTH IN AN AGREEMENT BETWEEN THE HOLDER AND THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER PURSUANT TO THE TERMS OF THE AFOREMENTIONED AGREEMENT. A COPY OF THE AGREEMENT MAY BE OBTAINED FROM THE COMPANY.

THE HOLDER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT HAS AGREED TO WAIVE ANY RIGHTS

TO OBTAIN INFORMATION CONCERNING THE ISSUER, INCLUDING PURSUANT TO SECTION 220 OF THE DELAWARE GENERAL COPORATION LAW. SUCH WAIVER IS BINDING UPON ANY TRANSFEREE OF THESE SECURITIES AND A CONDITION TO TRANSFER OF THESE SECURITIES IS THE TRANSFEREE'S AGREEMENT TO SUCH WAIVER. A COPY OF THE AGREEMENT MAY BE OBTAINED FROM THE COMPANY.

If any of the foregoing legends are no longer applicable, the Company may, upon the written request of a holder of Securities, remove any inapplicable legends from the stock certificate(s) or instrument(s) evidencing the Securities.

        **4.4**     **Stop-Transfer Instructions**. Each Acquirer agrees that, in order to ensure compliance with the Transfer Restrictions, the Indemnification Obligations, the Security Obligations, and the other restrictions set forth herein, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company acts as its own transfer agent, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Securities that have been sold or otherwise transferred in violation of any of the provisions of the Transfer Restrictions, the Indemnification Obligations, the Security Obligations, and the other restrictions set forth herein, or (b) to treat as owner of such Securities, or to accord the right to vote or receive dividends, to any Acquirer or other transferee to whom such Securities have been so transferred. Each Acquirer further understands and agrees that the Company may require written assurances, in form and substance reasonably satisfactory to counsel for the Company (which may include a requirement that Acquirer's counsel provide a legal opinion acceptable to the Company as provided in Section 3.1 above), before the Company effects any future transfers of the Securities.

        **5.**     **GENERAL PROVISIONS.**

        **5.1**     **Successors and Assigns; Non-Transferability**. Except as otherwise provided in this Agreement the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement without the consent of any of the Acquirers. None of the Acquirers may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, unless the Company provides prior written consent. The estate of each Acquirer, as applicable, shall be required to assume the obligations of such Acquirer, respectively, under the Settlement Agreements. Notwithstanding the third sentence of this paragraph, each Acquirer may transfer the Securities to his respective heirs provided that such heirs assume all of the obligations of the respective Acquirer that are set forth in the Settlement Agreements.

        **5.2**     **Governing Law**. The validity, interpretation, performance, and enforcement of this Agreement, as well as any other rights, obligations or liabilities otherwise related to the subject matter of this Agreement, shall be governed by and construed under the internal laws of the State of California as applied to agreements among California residents

entered into and to be performed entirely within California, without reference to principles of conflict of laws or choice of laws.

5.3     **Arbitration and Enforcement of Agreement.**     Any dispute or controversy of any kind between the parties hereto, whether arising out of, relating to or concerning any interpretation, construction, performance or breach of this Agreement, or otherwise, shall be settled by confidential arbitration to be held in Santa Clara, California in accordance with the commercial dispute rules then in effect of the American Arbitration Association.  The Arbitrator may grant injunctions or other relief in such dispute or controversy.  Judgment may be entered on the Arbitrator's decision in any court having jurisdiction.  The Company, on the one hand, and the Acquirers on the other hand, shall each be responsible for one half of the costs and expenses of such arbitration, and each shall separately pay its counsel fees and expenses; provided, however, in the event of a determination by the Arbitrator which is adverse to the Company or the Acquirers, as the case may be, the non-prevailing party or parties shall be responsible for all of the costs and expenses of such arbitration, and for all of the counsel fees and expenses of the Company or the Acquirers relating thereto.  For purposes of any action arising out of the application, interpretation or alleged breach of this Agreement, each of the parties hereto waives any statutory or common law principle, and any judicial interpretation of this Agreement, which would create a presumption against any party hereto as a result of such party having drafted any provision of this Agreement.  Counsel for the respective parties have reviewed and revised this Agreement, and there shall not be applied any rule construing ambiguities against the drafting party.

5.4     **Notices**.  Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following: (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States; or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by express courier.  All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto.  A "business day" shall be a day, other than Saturday or Sunday, when the banks in the city of San Francisco are open for business.

5.5     **Further Assurances**.     The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

5.6     **Titles and Headings**.  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

Bates #: Claimants' 0042

5.7    **Entire Agreement**.  This Agreement, the Note, the Security Agreement, the Confidential Agreement and the Warrants constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.  This Agreement shall not be effective until signed by all parties hereto, including the Company.

5.8    **Severability**.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in such agreement..

5.9    **Amendment and Waivers**.  This Agreement may be amended only by a written agreement executed by the Company and each of the Acquirers.  No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.  Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.  No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

5.10    **Confidentiality**.  Each of the parties hereto agrees that such party will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the Warrants in accordance with the terms of Section 8 of the Confidential Agreement.

5.11    **Counterparts; Facsimile Signatures**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  This Agreement may be executed and delivered by facsimile or other means of electronic delivery and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

**[Signature page follows]**

Bates #: Claimants' 0043

**IN WITNESS WHEREOF**, the Company has caused this Securities Acquisition Agreement to be executed by its duly authorized representative and each Acquirer has executed this Securities Acquisition Agreement, as of the Effective Date.

**ACQUIRER: KEITH DAUBENSPECK**          **ACQUIRER: DWIGHT BADGER**

By: _____          By: _____

Address: _____          Address: _____

_____          _____

_____          _____

**COMPANY:**

**BLOOM ENERGY CORPORATION**

By: _____

Its: _____

Address:    1299 Orleans Drive

            Sunnyvale, CA 94304

**Attachments:**
Exhibit 1 – Allocations of Securities Between Acquirers
Exhibit 2 – Form of Series G Warrant
Exhibit 3 – Form of Common Stock Warrant
Exhibit 4 – Securities Power
Exhibit 5 – Form of Issuance Certificate

**[SIGNATURE PAGE TO SECURITIES ACQUISITION AGREEMENT]**

## EXHIBIT 1

### ALLOCATIONS OF SECURITIES BETWEEN ACQUIRERS

| Acquirer | First Issuance | | | Second Issuance | Third Issuance |
|---|---|---|---|---|---|
|  | Shares of Series G Preferred Stock | Warrants for Series G Preferred Stock | Warrants for Common Stock | Shares of Series G Preferred Stock | Shares of Series G Preferred Stock |
| Keith Daubenspeck | 50,000 | 200,000 | 25,000 | 50,000 | 100,000 |
| Dwight Badger | 50,000 | 200,000 | 25,000 | 50,000 | 100,000 |

***

## **EXHIBIT 2**

## **FORM OF SERIES G WARRANT**

## **EXHIBIT 3**

## **FORM OF COMMON WARRANT**

## **EXHIBIT 4**

**SECURITIES POWER
AND ASSIGNMENT SEPARATE FROM INSTRUMENT OR CERTIFICATE**

## Securities Power And Assignment
## Separate From Instrument or Certificate

FOR VALUE RECEIVED and pursuant to that certain Securities Acquisition Agreement, dated as of June, __, 2014 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the _____ Stock / warrant to purchase _____ shares of the _____ Stock of Bloom Energy Corporation, a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by and Certificate No(s). _____ or other instrument delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said Securities on the books of the Company.  *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO*.

Dated: _____


_____
(Signature)

_____
(Please Print Name)



**Instruction:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Securities Power and Assignment is to enable the Company and/or its assignee(s) to acquire the shares upon exercise of its rights under the Agreement, without requiring additional signatures on the part of Acquirer.

## <u>EXHIBIT 5</u>

## FORM OF ISSUANCE CERTIFICATE

## **ISSUANCE CERTIFICATE**

Pursuant to Section 1.3(e)(ii) of the Securities Acquisition Agreement (the "***Agreement***"), dated as of June 27, 2014, by and among Dwight Badger and Keith Daubenspeck, Bloom Energy Corporation, a Delaware corporation (the "***Company***"), and certain other parties, I do hereby deliver this certificate (the "***Certificate***") to the Company and certify under oath and penalty of perjury that:

1. This Certificate is being delivered in connection with the following Issuance (as defined in the Agreement) (the "***Current Issuance***"):

   ❐  The Second Issuance (as defined in the Agreement).

   ❐  The Third Issuance (as defined in the Agreement).

2. I am duly authorized to make, execute and deliver this Certificate.

3. Each of the representations and warranties contained in Section 2 of the Agreement as they apply to me continue to be true and complete on and as of the date of the Current Issuance with the same effect as when they were made on and as of the Effective Date (as defined in the Agreement).

4. I have performed and complied with, and have not breached any of, the terms, agreements, obligations and conditions of any of the Settlement Agreements.

5. I hereby agree, confirm, and acknowledge that the Securities (as defined in the Agreement) being issued to me in the Current Issuance are subject to the Transfer Restrictions, Indemnification Obligations, the other restrictions, and, in the case of the Third Issuance, the Security Obligations (each as defined in the Agreement) and any transferee of such Securities shall also be bound by the Transfer Restrictions and the other restrictions in accordance with the terms of the Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed this Issuance Certificate as of the date set forth below.


By:   _____

Name:   _____

Date:   _____

**IN WITNESS WHEREOF**, the Company has caused this Securities Acquisition Agreement to be executed by its duly authorized representative and each Acquirer has executed this Securities Acquisition Agreement, as of the Effective Date.

**ACQUIRER: KEITH DAUBENSPECK**          **ACQUIRER: DWIGHT BADGER**

By: _____          By: _____

Address: _____          Address: _____

_____          _____

_____          _____

**COMPANY:**
**BLOOM ENERGY CORPORATION**

By: _____

Name:    William H. Kurtz

Its:       Chief Financial Officer, Chief
          Commercial Officer, and Secretary

Address:  1299 Orleans Drive

          Sunnyvale, CA 94304

**Attachments:**
Exhibit 1 – Allocations of Securities Between Acquirers
Exhibit 2 – Form of Series G Warrant
Exhibit 3 – Form of Common Stock Warrant
Exhibit 4 – Securities Power
Exhibit 5 – Form of Issuance Certificate

**[SIGNATURE PAGE TO SECURITIES ACQUISITION AGREEMENT]**

**IN WITNESS WHEREOF,** the Company and the Holder have caused the Warrant to be executed by a duly authorized officer thereof as of the effective date of this Warrant set forth above.

**BLOOM ENERGY CORPORATION**

By: _____

Name:  William H. Kurtz

Title:   Chief Financial Officer and Secretary

**AGREED AND ACCEPTED:**

**DWIGHT BADGER**

By: _____

Name: _____

Title: _____

Address: _1392 W. Old Mill Road_____

_Lake Forest, IL  60045_____

**[SIGNATURE PAGE TO COMMON STOCK WARRANT]**

**IN WITNESS WHEREOF,** the Company and the Holder have caused the Warrant to be executed by a duly authorized officer thereof as of the effective date of this Warrant set forth above.

**BLOOM ENERGY CORPORATION**

By: _____

     Name:  William H. Kurtz

     Title:    Chief Financial Officer and Secretary

**AGREED AND ACCEPTED:**

**DWIGHT BADGER**

By: _____

Name: _____

Title: _____

Address: <u>1392 W. Old Mill Road</u>

         <u>Lake Forest, IL  60045</u>

**[SIGNATURE PAGE TO SERIES G PREFERRED STOCK WARRANT]**

**IN WITNESS WHEREOF,** the Company and the Holder have caused the Warrant to be executed by a duly authorized officer thereof as of the effective date of this Warrant set forth above.

**BLOOM ENERGY CORPORATION**

By: _____

Name:  William H. Kurtz

Title:    Chief Financial Officer and Secretary

**AGREED AND ACCEPTED:**

**KEITH DAUBENSPECK**

By: _____

Name: _____

Title: _____

Address:  1807 N. Fremont

Chicago, IL  60614

**[SIGNATURE PAGE TO COMMON STOCK WARRANT]**

Bates #: Claimants' 0055

**IN WITNESS WHEREOF,** the Company and the Holder have caused the Warrant to be executed by a duly authorized officer thereof as of the effective date of this Warrant set forth above.

**BLOOM ENERGY CORPORATION**

By: _____
Name:  William H. Kurtz
Title:    Chief Financial Officer and Secretary

**AGREED AND ACCEPTED:**

**KEITH DAUBENSPECK**

By: _____

Name: _____

Title: _____

Address: 1807 N. Fremont_____

Chicago, IL  60614_____

**[SIGNATURE PAGE TO SERIES G PREFERRED STOCK WARRANT]**